(No. 87-CC-1795–)

TERRY WILLIAMS, a/k/a VINCER MITCHELL, Claimant, *v.*
THE STATE OF ILLINOIS, Respondent.

*Opinion filed November 2, 1999.*

STUART JOSHUA HOLT, for Claimant.

JIM E. RYAN, Attorney General (WARREN BENNING,
Assistant Attorney General, of counsel), for Respondent.

## OPINION

RAUCCI, C.J.

This is a prisoner tort action arising out of an incident which allegedly occurred on June 10, 1986, at the Illinois State Penitentiary in Pontiac, Illinois, where the Claimant was incarcerated. Claimant alleges that while on his work assignment duty in the upper inmate dining room at Pontiac, the front cover of a fan fixture fell, striking him on his back and that he sustained serious injuries. Claimant alleges that Respondent, State of Illinois, was under a duty to maintain in a suitable safe condition the building and its fixtures, including the covers on the fan fixtures so that they would not fall and injure persons occupying the premises.

At trial, Williams appeared *pro se* and stated that he preferred to be addressed as Vincer Mitchell. Since this claim was filed at a time when he was known as Terry Williams, we will continue to refer to Claimant as Terry Williams.

Mr. Williams explained that his attorney, Mr. Stewart J. Holt of Chicago, Illinois, had made contact with him and he had been advised that Mr. Holt would not appear for the hearing. Williams acknowledged that his attorney had encouraged him to proceed *pro se* or to retain a local attorney. Mr. Williams announced his readiness to proceed. Williams said that he was at Pontiac Correctional Center in the "chow hall playing cards" when a fan cover fell from the ceiling and hit Claimant in the back. Claimant was taken to an outside hospital, put in traction for three days and returned to Pontiac. Shortly before the incident, Claimant had been moved to Pontiac from Jacksonville Correctional Center where Claimant had undergone an operation on his lower back. Claimant said that

he believed that the fan "rotated" and hit the wall and then the fan cover fell "a good 15 feet" and struck him. Claimant estimated the size of the fan cover to be about the size of a 15 inch tire for an automobile and that its weight was 10, 15 or 20 pounds. Claimant assumed that the fan cover as made of steel as opposed to plastic.

Claimant contends that after he was returned to Pontiac, he was placed in the Pontiac Hospital for back therapy. He also says that he was returned to the outside hospital on several occasions, the number of which he was uncertain about. Claimant said that, during the time he was being taken to an outside hospital for treatment from the Pontiac Correctional Center, he was having numbness from his lower hip down to his toe on the left side. On occasion he was in so much pain he couldn't walk up the stairs and was "bent."

Claimant was put on medical leave and never returned to prison employment after the incident.

Claimant's treatment continued while he was at Pontiac by his being taken to outside hospitals over a period of two or three months. At such time as Claimant ceased being taken to outside hospitals for therapy, his medical treatment at Pontiac ceased.

During a time after Claimant was discharged from the Department of Corrections, he was examined by Dr. Gleason. At the time of the examination while Claimant was "on the street," Claimant was not receiving medical treatment but was taking Motrin. While out of prison, he worked at the Chicago Yacht Service for about a year and a half detailing (cleaning) boats. His employment terminated because Claimant "wasn't getting along with certain people on the job." Claimant also worked at O'Hare Airport where he "checked on security" but he contends he

lost that job because "the standing up caused tension" on his lower back. Claimant was last treated for the injury in 1996 after his re-incarceration, when he was given steroid shots in his back at Graham Correctional Center. The steroid shots helped. At the time of the hearing, Claimant testified he has problems only when he sleeps a certain way and lays on his stomach or his right side. If he picks anything up that is heavy, he gets a pain from his lower left hip all the way down to his left big toe. Claimant recalls that when he was actively being treated by physicians he was restricted to lifting nothing over 50 pounds.

The surgery Claimant had at Jacksonville prior to his injury in this case was because he couldn't straighten up due to a ruptured disk in his lower back. Claimant said his ruptured disk wasn't as a result of an accident, but just deterioration. Claimant was on the boxing team and did not believe the boxing ruptured the disk.

At the time of hearing, Claimant was 37 years of age, 5 feet, 9 inches tall, weighing 140 pounds. Claimant testified that his weight had not varied over five pounds from the time of the incident in 1986 to the present.

Claimant testified that, after his initial surgery at Jacksonville, he was cured and was able to straighten up and didn't feel that he had any problems. Claimant admitted that he underwent no surgery after the fan cover fell and struck his back, but was only taken back and forth to the outside hospital and given shots in his lower back for pain.

Claimant testified that he sustained a long laceration and resulting scar across his back where the fan cover struck him. It was not sutured.

Claimant had no medical expense as a result of the injury, as all of it was paid by the Department of Corrections.

Edward W. Grant, a chief electrician at the Pontiac Correctional Center, testified on behalf of Respondent. Grant had worked at Pontiac for 24 years. Grant described the fan in question as a 24-inch stationary mounted, three-blade Dayton fan. Grant testified that the fans are stationary and do not oscillate. Grant testified that the maintenance problems with the fans came from the fact that the "grates" were getting knocked off by the prisoners so that pieces of the "grates" could be used for weapons. The wire on the front of the fan is very hard and makes a good weapon. Grant testified, "that was the maintenance problem with these fans." Grant testified that the front of the fan would weigh from five to seven pounds. Grant testified that he determined that the fan cover came off because somebody bent it with something heavy, like a mop handle.

In questioning by the Commissioner, Grant testified that the fan covers can't just "come off" but must be "broke loose" first.

Lt. Larry Crosiar was called and testified on behalf of Respondent. At the time of his incident he was a "feed Lieutenant" running feeds which included making sure the dining room was clean and the chow lines called in the correct order. Prior to Claimant's injury there had been no complaints made as to the fans in the dining hall. Daily inspections are made of the whole dining room and kitchen area, and there is a weekly summary report which would include the fans. Inmates were known to attempt to steal pieces of the fans to make weapons. Crosiar did not remember the incident where it was alleged that Claimant was injured. Inspections of the dining room including the fans were done nightly whether Lt. Crosiar was there or not.

Ronald Gruber was called and testified on behalf of Respondent. Gruber was in charge of medical records at

Pontiac at the time of Claimant's injury. The records showed that Claimant underwent a laminectomy in September of 1985. No restrictions were placed on the Claimant. The records revealed that on June 10, 1986, there was an injury report which stated that part of a fan cover fell on the Claimant's back causing him to be sent to the local emergency room at St. James Hospital and examined. The records reveal that a contusion was noted in the area of the Claimant's lower back. Gruber testified that a contusion was a black and blue area. Gruber testified from the records that Claimant's final diagnosis was lumbosacral sprain and contusion of the back. He had been admitted on June 10, 1986, and discharged June 13, 1986.

After he was discharged, Claimant was sent out "multiple times on medical furloughs" for evaluation. Claimant was ultimately seen by Dr. Sinha, the surgeon who had seen him prior to the incident of the fan falling on him. Sinha's summary contained a clinical impression that Claimant suffered from chronic lumbosacral sprain. Gruber testified that Claimant had a lot of testing. The testing, according to the specialist Dr. Sinha, revealed that according to the CAT scans, findings were non-specific, the MRI was normal, and the routine X-rays of the spine and pelvis were all within normal limits. Gruber had no information after March 3, 1988.

On questioning by the Commissioner, Gruber testified that the original notes from the emergency room where Claimant was taken after the alleged injury made no mention of a laceration.

On cross-examination by Claimant Williams, Gruber testified that he was seen at the emergency room by Dr. Managat. The examination notes from the emergency room reflect that Claimant suffered severe tenderness MW paraspinal muscle spasms starting from L-1, S-1, but

that the other tests were essentially negative, and that the Claimant should be retained for observation.

The evidence deposition of Dr. John F. Gleason was taken August 28, 1995, and admitted as Respondent's exhibit C. Gleason testified that, at the time he first saw Williams on August 19, 1993, a history was taken of the accident and Williams' prior stories of his medical background. Williams testified that early in 1986 while incarcerated, he was sitting and a ceiling fan fell and landed in the middle of his back. Gleason testified at length as to Williams' complaints. On examination, Gleason found there was some straightening of Williams' normal lumbar lordosis. Williams had sustained no gluteal atrophy. Gleason testified that the results of the tests on Williams were that "it was a normal finding." There were no restrictions. Gleason's extensive examination of Williams on August 19, 1993, concluded that his symptoms were consistent with someone who had had a laminectomy in his low back but was otherwise normal, and would result in no restrictions related or secondary to the fan striking his upper back. All restrictions were secondary to the surgery of 1985, before he was struck on the back. The laceration on his left upper lumbar area and the tenderness at that site were secondary to the fan striking the Claimant. There were two injuries and two separate areas.

A second evidence deposition was taken of Dr. Gleason on May 20, 1996. Subsequent to his first deposition, Dr. Gleason was given medical records on Claimant from the Claimant's partial laminectomy on September 25, 1985, which was necessitated by a ruptured L-5, S-1 disk on the left side. After reviewing the record, Dr. Gleason formed an opinion which he gave in writing as Respondent's exhibit no. 2. Exhibit no. 2 made clear the fact that the review of the data from the earlier surgery

did not alter Gleason's opinion expressed in his independent medical examination on August 19, 1993. In the second deposition, Gleason testified that Claimant's occasional mid- and low-back pain may be linked secondarily to the fan cover incident.

Claimant waived briefing.

The evidence in this case established that an accident occurred which caused physical injury to the Claimant as a result of an instrumentality that is under the control of the State. This Court has repeatedly held that the State of Illinois owes a duty to inmates of its penal institutions to provide them with reasonably safe conditions. (*Reddock v. State* (1978), 32 Ill. Ct. Cl. 611; *Thomas v. State* (1987), 40 Ill. Ct. Cl. 188, 190.) When an injury has been caused by something under the management of the State, and the injury is one that, in the ordinary course of events, would not have happened if the State had exercised proper care, the accident itself affords reasonable evidence, in the absence of an explanation, that the accident arose from the State's want of due care. (*Thornton v. State* (1993), 45 Ill. Ct. Cl. 272, 275.) This would be particularly true when the State has notice of potential defective conditions that could cause an injury. (See *Thornton, supra*, p. 275.) In *Holt v. State* (1990), 43 Ill. Ct. Cl. 195, a window fell on the Claimant's hand, severing a finger. The claim was based on the theory that the prison guard's knowledge of the use of a stick to prop the window open created liability on the part of Respondent. This Court pointed out that it has been previously held that the State owes a duty to inmates of its penal institutions to provide them with safe conditions under which to perform their assigned work. (*Reddock v. State, supra*; *West v. State* (1977), 31 Ill. Ct. Cl. 340; *Spears v. State* (1985), 37 Ill. Ct. Cl. 164.) This Court concludes that the

State owes a duty to inmates to provide them with a safe place to live.

The evidence in this case establishes that the fan is a permanently mounted fixture out of the normal reach of inmates to provide air movement in the area where the inmates eat. The evidence adduced by the State established that the guards in charge of the area were aware that inmates attempt to remove the covers from these fans with the use of broom or mop handles, so that weapons can be made from the metal in the covers. Inspections were said to be conducted daily.

In the case at bar there is absolutely no evidence that the Claimant in this case was involved in any effort to remove the cover, but was simply present in the dining room, unluckily beneath the area where the fan was located. The evidence is undisputed that the fan cover fell causing injury to Claimant's back. There is also no doubt that the fan cover would not have fallen from its position on the fan had there not been damage done to the fan by the actions of other inmates. Apparently Respondent seeks to avoid liability in this case on the theory that, since the fan cover would not have fallen but for the illegal and destructive acts of inmates generally, the State should not be held liable when the fan cover falls, striking an otherwise innocent inmate.

It is the finding of this Court that the State is liable for Claimant's injuries sustained in this accident. The instrumentality causing the injury to Claimant's "upper lower back" was within the control of Respondent, and this injury would not have occurred if the fan cover had not been loose, thereby allowing it to fall on the Claimant.

A more difficult question for the Claimant exists in the measure of Claimant's injuries.

Claimant would have this Court believe that the 1985 surgery undertaken by Claimant was a complete success and left Claimant with no symptoms whatsoever relating to his back. He would have this Court believe that all of the symptoms which he now claims to endure are related to the injury caused by the fan cover falling on his back. Unfortunately, the expert testimony of Dr. Gleason in two separate evidence depositions establishes clearly that any symptoms of which Claimant complains at the present are related to the earlier laminectomy and not any injury sustained in the accident which gives rise to this claim. The most that Dr. Gleason would say in respect to symptoms reasonably related to the injury caused by the fan cover is that Claimant may feel mild discomfort from time to time as a result of the scar tissue in the area of the location where the Claimant's back was struck. The examination given by Dr. Gleason to the Claimant was exhaustive and was negative in the sense that Gleason's findings were all within normal range. The medical evidence does not support Claimant's contentions respecting the symptoms from which he now contends he suffers. Despite the fact that the injury sustained by Claimant is relatively minor, Claimant is entitled to an award of damages.

We find that Claimant is entitled to an award of $2,500.

It is therefore ordered, adjudged and decreed that Claimant is awarded two thousand five hundred and no/100 ($2,500) dollars in full and complete satisfaction of this claim.